BURNES *v.* BURNES, ADMINISTRATOR.

4-6521                                      157 S. W. 2d 24

Opinion delivered December 8, 1941.

*John G. Rye* and *W. F. Reeves,* for appellant.

*Elmer Owens* and *Moore & Henley,* for appellee.

SMITH, J. The question presented on this appeal is the validity of the following contract:

"State of Arkansas

"County of Marion

"Be it known to all men by these presence, that B. F. Burnes and Hester Lay, who are about to contract a marriage under the laws of the state aforesaid, and for their mutual benefit, and well being, have entered into this contract, which shall be held sacred and binding forever.

"1st   The said B. F. Burnes agrees to provide for her, a home such as he now has, or that may be in his ability to provide, so long as the said Hester Lay makes him a good and faithful wife, or until his death, should it occur first.

"2nd   The said B. F. Burnes is to be the sole manager of his own affairs, and shall be the judge of the living mentioned above, and also to govern his own house, as his judgment dictates.

"3rd   The said B. F. Burnes agrees to send the two children that she now has, to school, and give them a chance to fit themselves for the ordinary duties of life.

"4th   And for this consideration, the said Hester Lay agrees to make a good and faithful wife, and to live above reproach..

"5th   She also waives all her rights to claim homestead, or dower in any of the property, either real or personal, of which the said B. F. Burnes now possesses, or may possess at his death. She also waives any right to claim any of the property of the said B. F. Burnes, whatsoever, under any pretense or consideration.

"6th   She also agrees that in case of divorce, she will secure the same herself and waives all rights to alimony or maintenance or moneys, or considerations under any other name and that none of the property of the late B. F. Burnes shall be held for same.

"7th   It is further stipulated in this contract that each of the contracting parties shall hold and maintain their property, both real and personal, separate from the other, and that neither shall have any claim on the other's property, but that B. F. Burnes agrees to manage all the property of both to the best of his ability.

"And now after due consideration we have both signed this contract, and have affixed our seal, this 14th day of November, 1927.

> "Signed:   B. F. Burnes
> "Signed:   Hester Lay."

This instrument was not acknowledged and there was no witness.

At the time of the execution of the contract the man was 62 years old, and the father of fifteen living children by a former marriage. The woman was 22 years old, and the mother of two small children by her former marriage. She had no home of her own, and owned no property of any value, and lived with her mother. The parties were married nine days after the date of the instrument, and lived happily and prosperously together until the death of the husband on January 22, 1941. After his death the writing copied above was pleaded in bar of the wife's claim of homestead, dower and statutory allowances.

The court below held the contract was valid, and was a bar to the wife's claim, and dismissed her suit, and from that decree is this appeal.

It was shown, without dispute, that Mrs. Burnes made her husband a loyal, frugal and industrious wife, and that through her efforts he purchased, after the marriage, an additional 80-acre tract of land of small value. In addition to her domestic duties, she milked daily from four to twelve cows, and sold both milk and butter, the proceeds of which were given to her husband. On the other hand, Mr. Burnes furnished his wife and her two children a home, and gave them the school advantages which the community afforded. In addition, he gave her a policy of insurance on his life in the sum of a thousand dollars, which was collected after his death. It does not appear when the insurance was taken out, but it was not required by the contract.

A son of Mr. Burnes qualified as administrator of his estate, and his inventory showed lands, including the homestead, of a value less than $1,500, a stock of merchandise amounting to about $600, and other personal effects, (including $920 in cash, at his home) not exceeding $1,500, making a total value of the estate approximately $3,600. Mrs. Burnes succeeded her husband as postmistress of the village where they resided, and included in the cash in Mr. Burnes' possession at the time of his death were the postal funds amounting to about $100, which were paid to Mrs. Burnes.

The testimony in regard to the execution of the contract was to the following effect. The parties were married November 23, 1927, nine days after the date of the contract. There had never been any previous conversation between the parties about the contract. Mrs. Burnes admitted she had signed the paper and stated that she did so because Mr. Burnes asked her to do so. It was never explained to her, and she did not know its provisions. She was wholly inexperienced in business, and had never signed any other contract.

The only testimony at all contradictory of this was that given by a daughter-in-law as follows: "Q. Will

you tell the court what was said about this contract? A. I couldn't tell the whole conversation, but we were trying to console Hester and she of course was very grieved over the loss of Mr. Burnes and I asked her if Mr. Burnes left a will. She kept crying and she said, 'Well, not only what he wrote himself before we were married and we both signed it.' I asked her if that was still his wishes and she said, 'I can't tell exactly what it was, but he was to take care of her and the children as long as he lived and said that at his death Howell and Theo would take charge.' Q. Who else was present during this conversation? A. No one."

Mrs. Burnes testified that her husband had frequently told her "That as long as I lived it (the homestead) was to be my home," and the effect of her testimony is that she was unaware that she had signed any contract to the contrary. A circumstance strongly corroborative is that Mrs. Burnes gave her husband's papers, after his death, to one of his sons, and included among the papers was the contract, and she was apparently unaware of its provisions until it was read to her after her husband's death.

Antenuptial or marriage contracts are of ancient origin, and we have long had a statute regulating them, which appears as Chapter 106 of Pope's Digest. This statute is for the protection of the woman who becomes a wife and of creditors. These contracts are required to be in writing and to be acknowledged, and are ineffective, except between the parties and such persons as have actual notice thereof, until they have been deposited for record with the clerk and recorder of the county where the real estate affected is situated.

It was held in the case of *Sims* v. *Roberts,* 188 Ark. 1030, 68 S. W. 2d 1001, that the statutes requiring marriage settlements to be acknowledged and recorded have no application as between the parties to the settlement and their privies. We cannot, therefore, hold the contract invalid in this case because it was not acknowledged and recorded; but the question remains whether it was otherwise valid.

In the case of *Davis* v. *Davis,* 196 Ark. 57, 116 S. W. 2d 607, the man and the woman executed and acknowledged, in duplicate, an antenuptial agreement which provided that the wife, if she survived her husband, should take only $100 of his estate, worth about $7,000. The wife survived her husband, and testified that the contract provided that she should have only the $100 in the event of separation or divorce, which did not occur. Objection was made to the competency of this testimony, but a decision of that question was pretermitted, it being said: ''As to whether she was a competent witness, we find it unnecessary to decide, in view of the fact that we are assuming, for the purpose of this opinion only, that she made the agreement to take only $100 in the event her husband should predecease her.'' Upon this assumption the contract was held unenforceable, and in so holding it was said: ''In *Brawley* v. *Rogers,* 188 Ark. 655, 67 S. W. 2d 176, the court used this language: 'The statute, §§ 7028, *et seq.,* Crawford & Moses' Digest, authorize the making of antenuptial agreements by parties contemplating marriage. The law has always allowed parties in contemplation of marriage to fix the rights of each in the property of the other by an agreement equitably and fairly made between them that will exclude the operation of the law in that respect. 13 R. C. L., pp. 1012-15. It is likewise held that marriage is a sufficient consideration for such antenuptial agreement or marriage settlement.' See, also, *Oliphant* v. *Oliphant,* 177 Ark. 613, 7 S. W. 2d 783. So it will be seen that the principle is announced in all of our cases, that in order for antenuptial contracts to be valid, they must be freely entered into, must not be unjust or inequitable and they must not be tainted with fraud. It appears to us that the contract in this case fails to meet these requirements in that it is an unjust and inequitable agreement.''

The testimony leaves the abiding impression that Mrs. Burnes thought she was to have a home for her lifetime, and that she did not know she was signing a writing depriving her of all interest in her husband's estate until after she had delivered the contract to her son-in-law without having read it.

In his excellent work on Domestic Relations, Mr. Rodgers, at § 379, p. 330, says: "The husband before marriage may settle property upon his wife in lieu of all her dower rights, and when he does so, the settlement is accepted, and is, moreover, free from fraud or unfairness of any kind on his part, the wife will thereafter be precluded from asserting any dower right in any of his property. Of course the settlement must be fair and *bona fide*. The parties naturally occupy a confidential relation to each other, and each acceding to the terms of the settlement has the right to assume that neither is attempting to overreach the other. 'While they may lawfully contract with each other where there is full knowledge of all that materially affects the contract, yet, where the provision secured for the intended wife is disproportionate to the means of the intended husband, it raises the presumption of designed concealment, and throws the burden upon those claiming in his right to prove that there was full knowledge on her part of all that materially affected the contract.' Where an antenuptial contract, therefore, was made between a man of means and an illiterate woman, whereby she released all her dower right to his estate without any material consideration, and the nature and effect of the settlement was not fully made known or explained to her, such an agreement was properly held not to bar her dower. And generally, if the provision be grossly inadequate, considering the value of the dower right, or if its effect is an imposition upon the property rights of the wife with reference to her dower, she will be permitted to claim the same."

Mrs. Burnes was not illiterate, but she was inexperienced, and relied implicitly upon her fiance, and we think it was not shown—the burden being upon the representatives of the husband's estate—that the contract had been knowingly entered into. It settled no property on the wife, and made no provision, not even a $100, as did the contract in the Davis case, *supra*, for her after the husband's decease.

In the chapter on Dower in 28 C. J. S., § 55, p. 125, it is said: "An antenuptial agreement making provision for the wife in lieu of dower must be reasonable in itself

and founded on adequate consideration. It must be made fairly, without fraud or imposition, and with a full understanding of its force and effect on the part of the wife. Such agreements will be regarded with the most rigid scrutiny and will not be enforced against the wife where the circumstances show that she has been over-reached and deceived. Owing to the confidential relations of the parties, and the nature of the transaction, such an agreement is considered sufficiently suspicious to cast the burden of proof upon him who seeks to support it to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscientious. And especially is this so where the contract is apparently unjust or inequitable, or disproportionate to the means of the husband. A presumption of fraud may arise from a grossly inadequate or manifestly unfair pecuniary provision. If the agreement is void in part it is inoperative *in toto.*"

An antenuptial contract was set aside in the case of *Shirey v. Shirey*, 87 Ark. 175, 112 S. W. 369, where it was said: "Fairness and good faith should characterize such a contract, and the provisions in this one for the benefit of the wife are so inadequate that a court of equity should set it aside on account of its unreasonableness, even if the wife possessed the legal capacity to enter into it. *Achilles* v. *Achilles*, 151 Ill. 136, 37 N. E. 693." See, also, *Comstock* v. *Comstock*, 146 Ark. 266, 225 S. W. 621. See, also, Lindey on Separation Agreements, Ante-Nuptial Contracts and Marriage Settlements, pp. 650, *et seq.*

We are constrained to the conclusion that Mrs. Burnes was not sufficiently apprised of the purpose and effect of the contract, and that it is unjust and inequitable, and should not be enforced.

The decree of the court below will, therefore, be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

GRIFFIN SMITH, C. J., (dissenting). In respect of antenuptial contracts, the majority holds that three things

must concur as conditions to validity: (a) The contract must be freely entered into; (b) it must not be unjust or inequitable, and (c) it must not be tainted with fraud.

It is then said: "It occurs to us that the contract in this case fails to meet these requirements in that it is an unjust and inequitable agreement."

As authority for reversing the decree, the opinion cites Rodgers on Domestic Relations, § 379, where it is said that the husband may settle property on his wife in lieu of her dower rights, and if the agreement is free from fraud or unfairness, the wife will be bound by such terms. The essential of fairness is stressed. The agreement must be *bona fide,* each party having the right to assume that there is no attempt to overreach. There is the further comment that where the provision made for the intended wife is disproportionate to the means of the husband-to-be, ". . . it raises the presumption of designed concealment and throws the burden upon those claiming in his right to prove that there was full knowledge on her part of all that materially affected the contract."

Of the three conditions held essential to a contract such as we are dealing with, it is only contended that two are present—the settlement, it is said, was "unjust and inequitable," and "the contract was not freely entered into."

There is not the slightest suggestion of fraud; nor is it hinted that Burns concealed from appellant the nature or extent of his property.

As the opinion correctly reflects, marriage was an arrangement of convenience, which seemingly ripened into affection. Age disparity was forty years. Each had formerly been married, and each had children. A widow of 22 does not, ordinarily, entertain for a widower of 62 the mating instinct so fortunately a part of youth's estate. Indeed, in the case at bar, possibility of divorce was recognized; and although the contractual provision in that regard would perhaps be unenforceable as in conflict with public policy, the fact that divorce was mentioned

evidences a purpose to anticipate any contingency that might arise.

Burns owed filial obligations to his own children, some of whom were in his home in November, 1927, when the marriage was consummated. The father had a right to think of his children's interests. He contemplated an arrangement whereby appellant and her children would have a home. The marriage status was maintained for thirteen years, and there is not so much as a hint that Burns did not meet his obligations with conscientious punctuality and with liberality. Insurance in appellant's favor was a substantial contribution beyond the written engagement; and in every way B. F. Burns dealt with Hester as a father would with a mature child.

There are no *disinterested* witnesses; yet, as between appellant and the daughter-in-law who testified regarding conversations, appellant's interest was greater than that of the witness.

Appellant is an intelligent woman with a fair degree of education. She has been appointed to her husband's position as postmaster.

The antenuptial contract is being nullified *not* because of fraud or coercion, or for any one of several causes that if existent might avoid it, but solely because of a belief by judges that it is inequitable, and (secondarily) because appellant says it was not explained to her.

It has long been the rule that (in the absence of fraud, intimidation, or undue influence) mature men and women not under disability have a right to contract, and that they may withhold or dispose of property. It is trite to say that courts interpret contracts, and do not make them.

By reversing this case the rule is established that a woman may, by means of a written agreement, proceed with marriage and accept its benefits for thirteen years, or for any other period. She may require the husband to educate the children born of a former marriage, and admit to a witness whose credibility is not impeached

that she understood her rights were to terminate with the death of her husband; then, on second thought, counter with the unsupported assertion that she did not read the contract, and was therefore not informed.

There is a clause in the contract permitting each party to ". . . hold or maintain [his or her] property, both real and personal, separate from the other."

If the situation were reversed, and appellant from her earnings had paid for property to which the husband took title, and it should be coveted by the intestate's heirs, this court would unhesitatingly say that the contract gave protection.

No thought seems to have been given the fact that the intestate's property (or at least a great deal of it) was acquired while the mother of his children was a helpmate. By the court's action in reversing the decree this dead mother's contributions, whatever they may have been, are transmitted to her successor in the home. This was the eventuality B. F. Burns endeavored to avoid by a contract judicially found to have been free from fraud, but which the majority here says must fail.

Mr. Justice McHANEY and Mr. Justice GREENHAW concur in this dissent.