Vola McDonald BABB, Widow of
Dain O. BABB, Deceased *v.* Darrell
BABB, Executor

CA 80-145                                    604 S.W. 2d 574

Court of Appeals of Arkansas
Opinion delivered September 17, 1980

*Mobley & Smith*, by: *William F. Smith*, Russellville, for appellant.

*Harper, Young, Smith & Maurass*, by: *Robert Y. Cohen, III*, Fort Smith, for appellee.

DAVID NEWBERN, Judge. The main question on this appeal is whether an antenuptial agreement is valid. The agreement was sustained in the lower court and was held to prevent the appellant from electing to take her statutory widow's allowance against the will of her deceased husband. We affirm because we agree with and find evidence of record to support the court's conclusion there was no fraud or misunderstanding with respect to the agreement and it does not violate public policy.

Vola McDonald was 57 and Dain Babb was 50 when they married in 1963. Both had been previously married. Vola, the appellant, had considerably more property than Dain at that time, and the record shows, and she does not question, that she knew the extent of his assets.

The appellant testified that Dain suggested they enter an agreement so that in the event of a divorce, such as the ones he had been through, she would not have the same property troubles he had had. Such an agreement ·was prepared by a lawyer selected by Dain. The agreement provided:

> This agreement is made this 8th day of July, 1963, by and between DAIN OLIVER BABB, of Johnson County, Clarksville, Arkansas of the one part, and VOLA MCDONALD, of Johnson County, Clarksville, Arkansas, of the other part.

> A marriage is intended between the parties, and in view of the fact that after their marriage, in the absence of any agreement to the contrary, their legal relations

and powers regarding property may, by reason of some change in their domicile, or other than those which they desire to have apply to their relations, powers, and capacities.

Dain Oliver Babb and Vola McDonald, agree and declare it to be their desire that during their marriage each of them shall be completely independent of the other as regards enjoyment and disposal of all property, whether owned by either of them at the commencement of the marriage or hereafter acquired, or coming to either of them during the marriage.

Each agrees that so far as legally possible by their act all the property belonging to either of them at the commencement of the marriage, or acquired by or coming to either of them during the marriage, shall be held and enjoyed by him or her and be subject to his or her disposition as his or her separate property in the same manner as if the proposed marriage had never been performed.

Upon the death of either, the survivor shall not have and will not assert any claim, interest, estate or title, under the laws of any state, because of such survivorship, in property, real, personal or mixed of which such deceased party may die seized or possessed; and such survivor hereby relinquishes to the heirs, administrators, executors and assigns of such deceased party all of his or her claim, distributive share, interest, estate, or title that he or she would be entitled to as the surviving husband or wife and agree upon demand to execute and deliver to the heirs, administrators, executors and assigns of such deceased party all such claim, interest, estate, right or title and upon demand to execute and deliver to the heirs, administrators, executors and assigns of such deceased party all instruments that may be necessary to carry out his or her agreements herein contained.

To the proper performance of all the foregoing agreements, covenants, and stipulations, the parties

hereto, respectively bind themselves, administrators, executors and assigns.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals at Clarksville, Arkansas, this 8th day of July, 1963.

The appellant testified she signed the agreement without reading it and that it was not explained to her. She said, however, that she was afraid about her property and knew about Mr. Babb's two prior divorces. It is apparent from the appellant's testimony she thought she would be protecting her property by entering the agreement but she knew the decedent's property would be kept separate also. The appellant testified consistently that she thought the agreement was to be effective only upon divorce. It is also apparent from her testimony that the appellant had refused to marry the decedent and that the agreement contributed in some degree to her willingness to marry him.

The parties lived together until Dain's death which occurred fifteen years after they married. Dain's will left his property to his children by his first marriage. He had accumulated an estate of considerable value in his own name during the marriage to Vola. To help in the acquisition of property, Vola had given him money on several occasions and had allowed him to run cattle on her farm.

### 1. *Fraud, concealment and misrepresentation*

The appellant argues the agreement was procured by fraud, concealment and misrepresentation. The record will not sustain a contention here there was any concealment of assets held by the decedent at the time the agreement was signed. Thus, the only misrepresentation to be seriously considered is the appellant's claim she was unaware the agreement provided she would not share in the estate of her prospective husband.

It is apparent the judge declined to believe the appellant's testimony in this respect. In his order, the judge stated: "That the ante-nuptial agreement was knowingly

entered into by the wife without any fraud *or misunderstanding*." (Emphasis added.) To support this conclusion, there was evidence that the appellant owned and had managed considerably property at the time she signed the agreement. She had sold a subdivision which she had acquired from her deceased first husband and purchased her farm. She had negotiated and managed gas well royalties, had once served as executrix of an estate and was a person of sufficient education, at least, to have been a practical nurse.

The appellant relies upon *Burnes* v. *Burnes, Adm'r*, 203 Ark. 334, 157 S.W. 2d 24 (1941). In that case a 62 year old man married a 22 year old widow who was not shown to have had any property at the time the agreement was entered. The agreement, by which Mrs. Burnes specifically relinquished her dower right in Mr. Burnes' real or personal property, was neither acknowledged nor recorded as was done here and as is required by Ark. Stat. Ann. §§ 55-301, 302 and 303 (Repl. 1971). Mrs. Burnes testified she knew nothing of the contents of the agreement she had signed. The court said the burden was on the husband's estate to show the contract was "knowingly entered into," and that burden was not met. The court noted that Mrs. Burnes was "wholly inexperienced in business, and had never signed any other contract."

The factual distinctions between that case and the one before us are numerous and obvious. But even in the *Burnes* case, Chief Justice Smith, in a dissenting opinion in which two other justices concurred, pointed out that the court was being too protective of an adult woman who had entered an agreement with no sign of coercion and no evidence that she was unaware of the estate of her intended spouse. He said:

> By reversing this case the rule is established that a woman may, by means of a written agreement, proceed with marriage and accept its benefits for thirteen years, or for any other period. She may require the husband to educate the children born of a former marriage, and admit to a witness whose credibility is not impeached that she understood her rights were to terminate with the death of her husband; then, on second thought, counter

with the unsupported assertion that she did not read the contract, and was therefore not informed.

> There is no clause in the contract permitting each party to '. . . hold or maintain [her is her] property, both real and personal, separate from the other.

> If the situation were reversed, and appellant from her earnings had paid for property to which the husband took title, and it should be coveted by the intestate's heirs, this court would unhesitatingly say that the contract gave protection.

While there was no support provision in the agreement before us and no witness said Mrs. Babb admitted knowing the contents of the agreement the theme of this dissent nonetheless rings true in this case.

The appellant contends she and Mr. Babb were "in love" and that this emotional condition was the reason she signed the contract at Mr. Babb's request and without reading it. We need not decide whether all women of all ages are entitled to the sort of protection Mrs. Babb seeks here, but we do hold that a woman who is 57 years old, who has some business experience and who apparently was concerned about holding on to her property which so clearly exceeded in value that of her prospective husband will not be permitted to excuse her allegedly unknowing entry into an ante-nuptial agreement by saying she was "in love." We find the following language to be particularly applicable here:

> In viewing antenuptial contracts which provide for the settlement of property rights upon death, courts invariably have begun with the realization that between persons in the prematrimonial state there is a mystical, confidential relationship which anesthetizes the senses of the female partner.

> . . .

> The presumption ignores those marriage agreements in which the parties have full knowledge of

what they desire from the other's estate and are far from being infatuated from each other. Thus, by invoking this presumption, the courts are ignoring the difference created by individual fact situations. While the presumption of a confidential relationship is definite and predictable, it is at the same time too indiscriminate in its automatic imposition of the confidential relationship burdens upon all who contemplate marriage. [Gamble, The Antenuptial Contract, 26 U. Miami L. Rev., 692 at 719, 720 (1972)]

The "confidential relationship" historically presumed to exist between engaged persons has been said to be the basis for the requirement that the prospective husband fully disclose his assets to the prospective wife. 2 Lindey, *Separation Agreements and Ante-Nuptial Contracts*, § 90 (1979). Disclosure of assets is not a problem in this case. However, this presumption of the nature of such a relationship which seems to be solely for the protection of women is indicative of the theme of antenuptial agreement cases, *i.e.*, the intellectual domination by males of females. "[E]ven though the male's supposed intellectual dominance over the woman is seen throughout the law of antenuptial agreements as requiring protection for the 'weaker' female, this premise is contrary both to the contemporary concept of the equality of women and to the freedom of mature parties to chart the rights and liabilities of their marriage relationship." Gamble, 26 U. Miami L. Rev., *supra*, at p. 693.

## 2. *Mutuality of obligation.*

The argument of the appellant that Mr. Babb's curtesy interest in her estate could have been terminated by her will overlooks the possibility that she might die intestate, perhaps because of an invalid will, and her estate would be protected by the agreement. In addition, the argument that there was lack of mutuality of obligation or consideration for an antenuptial agreement fails because marriage, alone, is consideration for the agreement. *Comstock* v. *Comstock*, 146 Ark. 266, 225 S.W. 621 (1920).

### 3. *Agreement contemplating divorce.*

The appellant argues that the agreement is void because it was made in contemplation of divorce. The agreement does not refer to "divorce." Perhaps the second paragraph of the agreement, which is unintelligible, was meant to deal with that contingency. At any rate our supreme court has held that an agreement which is not solely intended to be operative upon divorce is not void merely because it mentions or is operative upon divorce among other contingencies. *Dingledine* v. *Dingledine*, 258 Ark. 204, 523 S.W. 2d 189 (1975); *Hughes* v. *Hughes*, 251 Ark. 63, 471 S.W. 2d 335 (1971). As we said earlier, there is sufficient evidence to support the lower court's conclusion that the appellant entered the agreement "knowingly." The judge had reason not to have been persuaded by the appellant's testimony she understood the agreement would operate only upon divorce.

### 4. *Hearsay.*

The appellant's final contention is that the testimony of witnesses as to conversations with the decedent concerning the antenuptial agreement should have been excluded as hearsay. As we read the record, the hearsay objections of the appellant were sustained, and the evidence, although extensive, was taken only as a proffer. Thus there was no error.

### 5. *Conclusion.*

This opinion has not attempted to parse all of the major Arkansas cases dealing with antenuptial agreements. That has been done in Cathey, Ante-Nuptial Agreements in Arkansas — A Drafter's Problem, 24 Ark. L. Rev. 275 (1970) and Annot, 29 Ark. L. Rev. 480 (1976). The result in each of these cases is obviously somewhat dependent upon the facts surrounding the agreement's execution. In this case we agree with the lower court that we are not called upon to apply the outdated principles with which our supreme court has had to struggle for the protection of this appellant who cannot be said to be a woman who has, in a moment of giddy, romantic infatuation, cast the dye for a future as a homeless pauper. There may be men and women, even in this age, could

be unduly oblivious because of such feelings, and perhaps the law should protect them from themselves. The protection rendered, however, if it is to be continued, should be equal. Reminiscent of Chief Justice Smith's dissent in the *Burnes* case, *supra*, we would not seriously doubt the outcome had Mr. Babb, upon divorce or death of Mrs. Babb, been able to say Mrs. Babb procured the agreement and he signed it without reading it and needed to be protected from the provision precluding him from taking any of her property because he was "in love" when he signed.

Affirmed.